## ALLEN v. METROPOLITAN CASUALTY INS. CO. OF NEW YORK.

### No. 5965.

Court of Appeal of Louisiana. Second Circuit.

May 29, 1939.

north and south. Several scenic thorough-fares course through the park and connect with the highway therein. None crosses it. One of these lies east of said highway, passes in front of the City Auditorium, and is herein known as the Auditorium Drive.

At about 5:45 o'clock of the afternoon of February 14, 1938, before darkness had commenced, plaintiff, while driving a 1931 Chevrolet sedan, negotiated a left turn from the Auditorium Drive onto the highway with the view and purpose of traveling south. Shortly thereafter his car was struck by another machine proceeding on the highway toward the north. The latter vehicle, a Nash sedan of 1938 model, was owned by Everett W. Neyland and was operated at the time by Miss Dorothy Manuel with the permission of said owner. A public liability policy issued by the Metropolitan Casualty Insurance Company of New York insured the Nash.

Plaintiff, who was severely injured, asks damages in this cause. Only the insurer of the Nash car is impleaded as defendant. He charges that,—

" * * * said collision was caused solely and only by the gross carelessness, recklessness and negligence of the said Miss Manuel in the following particulars:

"(a) Driving along said concrete highway and through said Park at a fast and reckless rate of speed, several times in excess of the speed limit permitted.

"(b) Failing to keep a proper lookout for traffic on said highway and through said Park, both automobile and pedestrian.

"(c) In not having her car under control so that the same could be brought to a stop in a short distance.

"(d) In not applying her brakes and bringing her car to a stop.

"(e) In leaving her side of the highway and crossing to plaintiff's side thereof and running into him.

"(f) In driving said automobile while under the influence of intoxicating liquor."

Defendant denies that the driver of the insured car was guilty of negligent or faulty driving. Alternatively, it pleads that, "in the event Miss Manuel should be held to have been guilty of negligence which contributed to the collision, which is not admitted, but which is denied, then defendant shows that plaintiff was guilty of contributory negligence, proximately

Hawthorn, Stafford & Pitts, of Alexandria, for appellant.

K. Hundley, of Alexandria, for appellee.

HAMITER, Judge.

The City Park of Alexandria, Louisiana, located within the corporate limits of that municipality, comprises a tract about 35 acres. Numerous trees, shrubs and flowers beautify the grounds. It is bisected by U. S. Highway 165, which, for the sake of convenience, we shall hereinafter refer to as highway and consider as running

causing the collision, sufficient to bar recovery."

Under the judgment of the trial court, for which written reasons were assigned, plaintiff was permitted recovery in the sum of $5755.05. The appeal therefrom, prosecuted by defendant, has been answered. Plaintiff asks that the damage award be increased to $10,000.

As before shown, the collision occurred on the highway within the confines of the City Park of Alexandria, and in the vicinity of its junction with Auditorium Drive. This junction will hereinafter be referred to as the intersection. A city ordinance, being No. 255, restricts the speed of motor vehicles using the highway in that locality to 18 miles per hour, and notices stationed at appropriate places on the outskirts of the park recite, "Speed Limit, City Park, 15 miles an hour." However, motorists properly employing the highway are accorded, under the traffic regulations, the right of way over those entering it from Auditorium Drive and the other mentioned scenic thoroughfares.

Auditorium Drive is of macadam or "black top" construction, with a surface 20 feet in width, and is frequently used. It joins the highway, an 18-foot concrete slab with 5-foot shoulders, at an angle and on the latter's eastern side. A stop sign is located on said drive at a point 22 feet from the concrete. West of the highway, and almost directly opposite the mouth of Auditorium Drive, is a small structure used and known as a bus waiting station. This is 36 feet in width and its front is separated from the concrete slab by 36 feet of gravel.

Also west of the highway, a few feet from the concrete's edge, are two objects important in the consideration of this case and often referred to by counsel and the witnesses during the trial. Both are located south of the intersection. One is a sign attached to a piece of bent railroad iron which states, "Warning, Children at Play, Drive Carefully", the purpose of it being to assist in affording protection to the many children who use the circle playground situated behind and in close proximity to the bus waiting station. From the center of said intersection south to a point opposite this sign is a distance of approximately 45 feet. About 30 feet farther south is a power pole, the other above mentioned object.

At the time of the accident, Hynson Bayou marked the south boundary of the park and also the corporate limits of the City of Alexandria. This stream is spanned by a concrete bridge that is a part of the highway. Its center is 300 feet south of the middle of the intersection. South of the bridge, a distance of about 600 feet, is a roadhouse and saloon known as the Parkway Inn.

Plaintiff, during the afternoon in question, drove his 1931 Chevrolet sedan slowly in a westerly direction along Auditorium Drive and brought it to a complete stop before entering onto the highway. Considerable dispute exists as to the exact location on the black top that this stop was effected. If it was opposite the sign located 22 feet from the concrete, as defendant contends, then plaintiff was not in position to observe traffic on the highway approaching the intersection, because of dense shrubbery that occupied both corners. We are satisfied, however, that he halted his machine when its front end was 2 or 3 feet east of the slab, as he states. In this he is corroborated by one A. R. Reed, the only eye witness testifying other than the participants in the accident, who was standing just off the eastern edge of the concrete and approximately 30 feet south of the intersection. This found position permitted plaintiff a clear view of the highway in both directions.

After stopping, he shifted the mechanism of his machine into low or first gear and looked for approaching vehicles. None was to his right. On his left he observed the Nash car, driven by Miss Manuel, at or about the concrete bridge 300 feet away. It was traveling, according to the witness Reed, at about 55 miles an hour. This speed estimate is supported by the physical facts, particularly the distance that it knocked the Chevrolet backward. Plaintiff says, however, "I couldn't very well tell how fast the car was going coming toward me." Believing that a left turn could be safely negotiated, plaintiff attempted it. He steered his machine on a curve to the left and traversed the intersection. His car was proceeding toward the south, in second gear and at a speed of about 10 miles an hour, when the Manual vehicle departed from the east side, angled northwesterly, and crashed into the left front portion of it. Each automobile, following the impact, maneuvered an al-

most complete about-face. The Nash came to rest on the western edge of the highway, a few feet south of the children warning sign, located 45 feet south of the intersection's center, headed southwesterly. The Chevrolet halted on the gravel in front of the bus waiting station, facing northwesterly. The distance between the two cars after stopping was about 30 feet.

It is certain that plaintiff's car was occupying its right or western half of the highway when struck. The proof is conclusive on this. However, as to its exact location thereon at the moment of impact, the evidence is extremely conflicting. Various points are fixed by the witnesses, ranging from a few feet south of the south end of the intersection to a few feet north of the power pole, which, as before seen, is about 75 feet south of the intersection's center. Reed, the eye witness who was standing almost opposite the children warning sign, states that, "they came together to the left of me, angling from me to the left;" and he fixes the place at about 10 feet south of that sign. We think that this is more nearly the correct point of contact. Corroboration of Reed's testimony is furnished by the location of the Nash after stopping, and by skid marks on the highway south of the sign found by Mr. Julian Rachel, the manager of the City Park. It is therefore our conclusion that the front end of the Chevrolet sedan was approximately 55 feet from the center of the intersection, or 45 feet from the south side thereof, when hit by the Nash.

■ The trial judge found that Miss Manuel was operating her car while under the influence of intoxicating liquor. Respecting this he states: "From the testimony Miss Manuel, driver of the insured Nash automobile, evidently was considerably intoxicated at the time. She herself admitted that she had drunk two coca-cola highballs some time after four o'clock that afternoon, and had two more a few minutes prior to the time of the accident, which was about 5:45 o'clock. After testifying at length she finally admitted on cross-examination that she did not remember much about what did happen when the accident occurred." His finding is, we think, supported by the proof in the record. The mentioned last two drinks were obtained at the Parkway Inn. A young lady employee of that establishment, who describes her work as hopping cars, says that between 5 and 6 o'clock of such after-

noon she served them to Miss Manuel while in the car, and that an interval of about ten minutes separated the servings. Following this imbibing the Nash car was driven north along the highway a comparatively short distance and into the oncoming Chevrolet operated by plaintiff.

■ Defendant strongly urges that even if Miss Manuel was negligent, which it denies, there was negligence on the part of plaintiff which contributed to the collision and bars recovery by him. Of course, this defense is affirmative in nature and the defendant has the burden of sustaining it. In our opinion, that burden has not been discharged. Under the facts and circumstances of the case, we find no negligence of plaintiff which proximately contributed to the unfortunate occurrence. When he entered the intersection, after having completely stopped a few feet from the concrete, Miss Manual was almost 300 feet away. Although her approaching machine was observed, he did not appreciate the speed it was pursuing. Hazardous traffic conditions along the highway in the locality were furnished through the medium of the park's numerous trees and other growth, the playgrounds for children, and the several intersecting scenic drives, and were responsible for the maximum speed regulation on the concrete slab of 18 miles per hour. All of this was well known to plaintiff, and he was justified in his belief and assumption that the oncoming car would be operated in a manner demanded by those conditions and the traffic ordinance. If it had been so operated, obviously no collision would have resulted.

We are of the opinion, as was the trial judge, that the described intoxication of Miss Manuel, with the consequent lack of control of her car, and the speed that she was employing in violation of the traffic regulation, rendered her grossly negligent; and her negligence was the sole proximate cause of the accident.

It is our belief that if Miss Manuel had possessed her usual and proper mental faculties at the time, she could and would have avoided the mishap. Almost 300 feet separated her machine from that of plaintiff when the latter appeared on the highway. This distance argues strongly against the creation and existence of a sudden emergency by that appearance. On the completion of the Chevrolet's left turn, the Nash, according to the witness Reed, had negotiated only half the distance from

the bridge to the point where said witness stood, which point, as before shown, was 30 feet south of the intersection. The cars were then more than 100 feet apart. Reed further states that the Nash continued and then angled to the left side of the highway. With reference to the reason for this sudden change in its course, he says: "Well, it just appeared that she lost control of the car, nervous, lost control." The judge of the district court believed, as we do, that Miss Manuel would have observed plaintiff and continued driving her car on her right side with no resultant collision "had it not been for the intoxicated condition of Miss Manuel,— a contingency which plaintiff should not be blamed for not knowing and foreseeing."

The fact that the highway is, by ordinance, designated a right of way or favored thoroughfare, is of no moment in so far as this case is concerned. The Nash's distance from the intersection when the Chevrolet ventured therein, and the illegal speed employed, prevented its enjoying the superior right to proceed. The following extract from Murphy v. Hartley, 144 So. 785, 787, decided by this court, is pertinent:

"Defendants urge they were on a right of way street and were therefore entitled to the intersection. Any regulation of this character comes into application only when both vehicles are approaching the intersection at approximately the same time and under such circumstances as to make it reasonably necessary that one yield the right of way to the other. If there is no car on the favored street near enough to demand the right of way, when traveling at a speed not unlawful, the regulation has no application. Huddy's Encyclopedia of Automobile Law (9th Ed.) vol. 3–4, p. 262.

"One cannot, by violating the speed law, acquire a right he would not otherwise have. The right of a motorist on a favored street to assume that an automobile on an unfavored street will be brought to a stop before entering the intersection, does not permit him to disregard traffic regulations or to claim the right of way when too far from the intersection to be entitled thereto. Accordingly, he is entitled to the right of way only in case his car is traveling at a lawful rate of speed. Huddy's Encyclopedia of Automobile Law (9th Ed.) vol. 3–4, p. 264.

"If the vehicles do not reach the area of the intersection simultaneously, the right of way depends upon their relative positions, their relative distances from the intersection, and their relative speed. The regulation of one street being made a favored street by ordinance does not prohibit a vehicle on an unfavored street from attempting to cross, merely because a vehicle is in view on the favored street. It does not compel a driver approaching from the unfavored street to stop if the other vehicle is too far away to reach the intersection until he has crossed. He is not required to stop to look the entire length of the street nor to watch for distantly approaching vehicles to pass. Failure to properly estimate speed of distantly approaching cars does not of itself constitute negligence. Huddy's Encyclopedia of Automobile Law (9th Ed.) vol. 3–4, pp. 270, 271."

In support of its plea of contributory negligence defendant relies particularly on the cases of Smith v. Interurban Transportation Co., Inc., 5 La.App. 704; Buckner v. Powers, 12 La.App. 630, 125 So. 744; and Lofton v. Cottingham, La.App., 172 So. 377. Those authorities, in our opinion, are inapplicable to the present litigation. Important facts found therein, some of which are hereinafter pointed out, furnish distinguishing features.

In the Smith case the oncoming heavy bus was only 60 feet from the intersection, proceeding at 28 to 30 miles per hour, when the other machine unexpectedly entered the highway from the side and appeared in the bus's path of travel.

The plaintiff in Buckner v. Powers, supra, was guilty of contributory negligence. Quoting from the opinion therein [12 La. App. 630, 125 So. 746]: "The testimony as a whole and the physical facts show that defendant's car was almost to the intersection when plaintiff entered." The court further said, "In view of the fact that the collision took place in the intersection, before plaintiff got across, makes the conclusion inescapable that he entered the intersection when defendant's car was almost upon him." It further appears that said plaintiff proceeded into the right of way thoroughfare without bringing his car to a stop.

The defendant in the Lofton case drove his car from a dirt road onto U. S. Highway 165, the speed limit of which in that locality is 30 miles per hour, and turned

left in front of an oncoming machine. According to defendant's own testimony, he observed, before entering the intersection, the approaching machine when between 150 and 200 feet away and knew that it was traveling on a downgrade at a speed of at least 60 miles an hour. Under those circumstances, particularly in view of defendant's knowledge of the speeding car and its close proximity to him, we held that he was negligent and his negligence was a proximate cause of the accident.

In the instant matter the Nash was much farther from the intersection than were the machines in the discussed authorities, and it does not satisfactorily appear that plaintiff knew of the fast speed that it was employing.

■ With reference to the injuries which plaintiff sustained, the trial judge correctly found and said:

"Plaintiff was injured internally, bruises, from which, during the night at the hospital he developed severe abdominal bleeding. His condition within two or three days became critical, and for several days his survival was extremely doubtful. Two blood transfusions were administered. Two major operations were made. Drainage tubes had to be inserted and retained for many weeks, in fact up until about six weeks before the trial of the case. Morphine was administered every four hours for ten or twelve days to alleviate suffering, and thereafter as needed. He was kept in the hospital eight weeks; and was confined to bed a week after being carried home. His weight reduced from 145 to 75 pounds during the eight weeks he was in the hospital. He has been totally disabled ever since his injuries, is so at this time, and, according to the testimony of the doctors, he has a hernia, caused from the injury, which will continue to incapacitate him until relieved by another operation costing about $300.00. Dr. Hardy testified that he advises waiting five or six weeks before undergoing an operation, and that it should take three months thereafter before plaintiff would recover sufficiently so as to be able to do work of a reasonable character. Plaintiff was earning $15.00 per week at the time of the accident, which was February 14, 1938."

Plaintiff was awarded $4000 for his injuries, including pain and suffering, and $540 for loss of time. For necessary expenses, the following were allowed: Hospital bills, $367.55; nurse's bill, $45; doctors' bill, $500; ambulance charge, $2.50; and cost of additional operation, $300. The total amount granted under the judgment was $5755.05. Unquestionably, plaintiff was severely and seriously injured, and the amount awarded for his injuries is certainly not excessive. Neither do we think that it is inadequate. He is not considered as being permanently disabled. The evidence discloses that following the hernia operation and the required period of rest, he can perform manual labor as he did prior to the accident. The other items of damages are properly proved.

Accordingly, the judgment is affirmed.